UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DANARYAE LEWIS,<br><br>      *Plaintiff*,<br><br>v.<br><br>DISTRICT OF COLUMBIA,<br><br>      *Defendant.* | Civil Action No. 1:24-cv-00971 (CJN) |

**MEMORANDUM OPINION**

Plaintiff Danaryae Lewis, an African-American female firefighter and EMT at the D.C. Fire and Emergency Services Department, was terminated in May 2020 for failing to evaluate a pediatric patient whose mother reportedly refused care due to fears of COVID-19 transmission. Lewis claims here that her termination was the result of racial animus, and therefore violated 42 U.S.C. §§ 1981 and 1983. The District moves to dismiss. For the reasons below, the Court denies the District's motion but limits the theories of municipal liability that Lewis may assert going forward.

**I.  Background**

    **A.  DCFEMS Disciplinary Procedures**

As alleged in Lewis's complaint, all uniformed firefighters at the D.C. Fire and Emergency Services Department (DCFEMS) are members of the Local 36 Union of the International Association of Firefighters, and are governed by a collective bargaining agreement between the Union and DCFEMS. ECF No. 8-1 (Compl.) ¶ 13. That agreement "sets out the timeline and appeals process for disciplinary actions," but does not define what constitutes a disciplinable transgression at DCFEMS—beyond requiring that all discipline be for "just cause." *Id.* ¶¶ 15–16.

1

Nor does it "establish what sort of punishment can be issued for any particular transgression." *Id.* ¶ 16. Instead, whether and what punishment is appropriate for certain conduct are "management prerogatives" committed to the discretion of DCFEMS authorities. *Id.* ¶¶ 15–17.

The Fire Chief has "sole and exclusive power" to refer employees to DCFEMS' internal trial board, which issues discipline—up to and including termination—for ostensibly "serious" infractions. *Id.* ¶ 19. But there is no written standard or guideline defining "serious" infractions or requiring that all individuals accused of "serious" infractions be referred to the trial board. *Id.* ¶¶ 20–21. If the Fire Chief determines that a trial board hearing is warranted, he appoints its members, who will typically be three to four "upper-echelon" DCFEMS officers who report to him. *Id.* ¶¶ 22, 149.

When referring an employee to the board, the Fire Chief provides a recommended disciplinary outcome—i.e., demotion, suspension, dismissal, or the like. *Id.* ¶ 26. The trial board then "holds an evidentiary hearing to ascertain if there is sufficient evidence to support that action," although it "also has the ability to recommend a different disciplinary action than the one recommended by the Fire Chief." *Id.* ¶¶ 26–27. "However, the recommendation of the trial board is not binding on the Fire Chief," and he has discretion to "accept, reject or modify" its decisions. *Id.* ¶¶ 28, 47.

Disciplinary decisions of the Fire Chief appear final within the municipality. To be sure, D.C. law authorizes the Mayor to appoint, remove, promote, demote, and suspend all DCFEMS employees, according to rules and regulations promulgated by the City Council. *Id.* ¶ 48 (citing D.C. Code § 5–402(a)). But Lewis alleges, and the District does not presently dispute, that the Mayor's office since 2007 "has fully and unequivocally delegated such powers to the Fire Chiefs." *Id.* ¶¶ 49–50. Thus, "[w]hile it is conceivable that the Mayor could review the disciplinary and

termination decisions of the Fire . . . [C]hief[], the Mayor does not do so, and no disciplined employee has the ability to appeal direct[ly] to the Mayor to intervene in any disciplinary action." *Id.* ¶ 53. Instead, such decisions may be overturned only through arbitration initiated at the option of the Union, or by appeal to the Office of Employee Appeals (OEA), the Office of Human Rights (OHR), or the EEOC. *Id.* ¶¶ 33–34.

### B.  Factual Background

Lewis is an African American female firefighter and EMT who has been employed at DCFEMS since 2013. *Id.* at 1 & ¶ 115. On May 22, 2020, during a phase of the COVID-19 pandemic in which D.C. residents were subject to a stay-at-home order and strict social distancing guidelines, Lewis was working an ambulance shift alongside another African American EMT, Traes Ceasar. *Id.* ¶¶ 117,127–29, 146. As the first run of their shift, Lewis and Ceasar were dispatched to transport a six-year-old boy with a fever to a local hospital. *Id.* ¶ 118. Under DCFEMS's COVID-19 policies, ambulance crews were required to call patients on the phone before making physical contact with them, and ask that they come outside to be evaluated. *Id.* ¶ 130. Accordingly, when Lewis and Ceasar reached the address they had been given, Lewis called the child's mother (on speaker-phone, so both she and Ceasar could hear) and inquired about his condition. *Id.* ¶¶ 126, 131. Because Lewis and Ceasar could not find the mobile phone assigned to the ambulance—Lewis alleges that DCFEMS ambulance crews have a "common practice" of "hiding the mobile phone in a non-obvious location"—Lewis used her personal cell phone to make the call.[1] *Id.* ¶¶ 119–20, 124.

---

[1] Lewis and Ceasar apparently noticed that the phone was not in its place when they first got into the ambulance, and informed their lieutenant, who stated that he would "call the previous crew at lunch to give them some time to rest after their shift." Compl. ¶¶ 119, 121. But Lewis decided to call the previous crew herself to ask where they had put it, and was "waiting for

3

The mother reported that the child's only symptom was fever, and that his doctor had instructed her to call 911 but she did not know why. *Id.* ¶¶ 131–32. Lewis "asked the mother to bring the child downstairs to be evaluated and potentially [] transported to the hospital," but the mother refused, saying that she did not want him exposed to COVID. *Id.* ¶¶ 133–34. The mother further noted that she had not yet given him Tylenol to reduce his fever, as his doctor had directed, and stated that she preferred to monitor his fever after administering medicine. *Id.* ¶ 136. Lewis alleges that she "asked the mother if she was certain about not having the child transported to the hospital, and the mother adamantly refused," again citing her COVID concerns. *Id.* ¶ 137. Lewis then "ended the call by telling the mother that if she felt strongly [about] first giving the child the Tylenol, she had every right to do so, and that the mother could always call 911 again if the fever did not break." *Id.* ¶ 138.

Because the mother did not want to bring her child outside for evaluation, neither Lewis nor Ceasar personally evaluated him. *Id.* ¶ 141. Nor did they make visual contact with the child or his mother, or call a supervisor to assist. *Id.* at 2–3. Instead, they recorded the dispatch transaction as "No patient contact; cancelled on scene" and then "put themselves into service to respond to the next call." *Id.* ¶¶ 140–41.

DCFEMS later received a citizen's complaint alleging that Lewis and Ceasar had not evaluated the child. *Id.* ¶ 142. DCFEMS conducted an investigation, and ultimately wrote Lewis up for two violations: "Charge I, Violation of D.C. Fire and Emergency Medical Department Order Book Article XXIC, § 10 Position Responsibilities; and Charge II, Violation of D.C. Fire and Emergency Medical Services Department Manual and Pre-Hospital Protocols (2017) Standard

---

someone from the previous crew to call back when [she and Ceasar] received the dispatch." *Id.* ¶¶ 122–23.

4

Operating Guidelines Consent/Refusal of Care Policy." *Id.* ¶ 144. The "gravamen" of DCFEMS' claim against Lewis was that, despite the mother's objections, she "should have gotten dressed in PPE, entered the premises, and gone upstairs to evaluate the child." *Id.* ¶ 143. But DCFEMS also apparently "took issue" with Lewis's use of her personal cell phone to contact the child's mother. *Id.*

After reviewing the results of the investigation, Fire Chief John Donnelly, who is white, determined that both Lewis and Ceasar should be referred to a trial board for discipline. *Id.* at 2 & ¶ 146. A referral document sent to the board on Chief Donnelly's behalf recommended that Lewis be suspended for Count I and terminated for Count II, and that Ceasar, who was less experienced than Lewis, be suspended for 744 hours (approximately 4.5 months). *Id.* at 2 & ¶¶ 147–48; *see also* ECF No. 10-1. Chief Donnelly also appointed the four members of the trial board. *Id.* ¶ 149.

At the trial board hearing, "there was general agreement about what transpired." *Id.* ¶ 150. Lewis "admitted that it was an error in judgment not to don PPE and enter the house to assess the child," although she "presented substantial evidence that she had followed protocols as she understood them at the time." *Id.* at 3 & ¶ 150. Lewis also put on three character witnesses, who testified that she was an "excellent" firefighter. *Id.* ¶ 151–52. Two of the witnesses further testified that they had personally observed several other non-African American firefighters "proceed in the same fashion as [Lewis] during the pandemic, and not don PPE to enter a house where the patient declines transport to the hospital." *Id.* ¶ 152. In the view of those witnesses, terminating Lewis would be "too harsh a punishment for [her] transgression," which was a first offense and had not resulted in any harm to the child, and would also represent a departure from "how other fire fighters who had done the same thing were treated." *Id.* at 3 & ¶¶ 145, 153. Nonetheless, the trial board

5

ultimately recommended that Lewis be fired, and Chief Donnelly accepted that recommendation. *Id.* at 3 & ¶ 182. Chief Donnelly apparently also accepted the board's recommendation that Ceasar be suspended for 20 days—a substantial reduction from his initially proposed multi-month suspension. *Id.* at 2.

Lewis alleges that, four days after this incident, several non-black DCFEMS firefighters engaged in similar conduct but were not similarly disciplined. *Id.* at 24. In particular, she claims that on May 26, 2020, three units of DCFEMS personnel—all of whom were white or Hispanic, and two of whom held a "supervisor" or "battalion chief" role—were dispatched to a residential address on a report of "respiratory distress/possible suicide attempt." *Id.* ¶¶ 161–64. Police were also dispatched to the scene, and upon arrival "were able to speak to the patient and learned there was no active threat of public harm[] or death." *Id.* ¶ 164. They "decided police service was no longer needed," and so turned care over to DCFEMS, which had staged its personnel a block away. *Id.* ¶¶ 164–65.

According to the complaint, however, those DCFEMS personnel "never attempted to enter the residence of the patient, assess the situation, take vital signs, transport the patient to a nearby hospital, or obtain a signed medical release form." *Id.* ¶ 165. Instead, "they tried to coerce [the police] officers to transport the patient, without first determining if it was medically safe for another agency to transport her to the hospital." *Id.* ¶ 166. Lewis asserts that these firefighters were not referred to a trial board despite being "guilty of the exact same transgression for which [she] was referred to a trial board." *Id.* ¶¶ 167, 170. Indeed, Lewis asserts that their "transgression was arguably worse, because, unlike the facts in [her] case, the patient clearly needed to be transported to a hospital." *Id.* ¶ 168.

---

### C. Procedural History

According to Lewis, after she received notice of her termination, Union leadership neither "mentioned her right to grieve the termination [through arbitration], [n]or offered to grieve the termination [on] her behalf." *Id.* ¶ 44. Lewis therefore individually appealed her termination to the OEA, where an ALJ heard her case. *Id.* ¶ 154. The ALJ concluded that DCFEMS had applied "outdated and no-longer applicable regulations" to justify terminating Lewis, and further held that termination was "too harsh a punishment for [her] transgression, and not justified under the circumstances." *Id.* ¶¶ 155–56. DCFEMS appealed the ALJ's decision to the full OEA Board, arguing that DCFEMS had agreed with the Union to rely on the 2012 regulations rather than the 2017 ones. *Id.* ¶ 157. When the Board rejected DCFEMS' argument, DCFEMS appealed to D.C. Superior Court. *Id.* ¶¶ 158–59. There, Judge Kravitz held that more evidence was necessary to determine whether DCFEMS' application of the 2012 regulations was proper, and remanded the matter to the ALJ for additional fact-finding on that issue. *Id.* ¶¶ 159–60. Those proceedings are ongoing. *Id.* ¶ 160.

In April 2024, Lewis brought this race discrimination suit against the District under 42 U.S.C. §§ 1981 and 1983. She alleges that "Fire Chief Donnelly, who is an ultimate decision maker, made the decision to accept and enforce [her] termination, and that he did so out of racial animus." *Id.* ¶ 182. She also alleges that DCFEMS' "trial board policy itself is discriminatory against African Americans," and that "there is a custom, history[,] pattern[,] and practice at DCFEMS of referring African American fire fighters to trial boards while their non-African American colleagues are not sent to trial boards for the same or similar transgressions." *Id.* ¶¶ 183–84. As a remedy, Lewis seeks compensatory damages of at least $2 million, as well as "injunctive relief to ensure that [DCFEMS] adjusts its trial board policy [so] that it can no longer be

weaponized against African American fire fighters, and [so] that trial board referral, appointments, and results are fair and equitable for all." *Id.* ¶¶ 187–88. The District moves to dismiss Lewis's complaint. *See* ECF No. 10 (Mot.).

## II.     Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks and citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## III.    Analysis

"Section 1981 protects the equal right of all persons within the jurisdiction of the United States to make and enforce contracts, including contracts for employment, without respect for race." *Hamilton v. District of Columbia*, 852 F. Supp. 2d 139, 146 (D.D.C. 2012) (quotation marks omitted). "Section 1981 can be violated only by purposeful [or intentional] discrimination," and "[t]o prevail on a Section 1981 claim, a plaintiff must . . . ultimately prove that, but for race, [she] would not have suffered the loss of a legally protected right." *Dickerson v. D.C.*, 2022 WL 656172, at *9 (D.D.C. 2022), *aff'd*, 2023 WL 4067787 (D.C. Cir. 2023) (citations and quotation marks omitted).

"To obtain relief for a violation of the rights guaranteed by Section 1981 from a municipality," however, a plaintiff like Lewis "must bring a claim under 42 U.S.C. § 1983 for the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." *Id.* at *7 (quotation marks omitted). "And to do so, a plaintiff must meet the requirements for municipal

liability set forth in *Monell v. Dep't of Soc. Servs. of N.Y.*, 463 U.S. 658, 691 (1978)." *Id.* That standard requires plaintiffs to "demonstrate that the municipality acted in accordance with a 'government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *Id.* at *8 (quoting *Monell*, 436 U.S. at 694). "*Monell* rejects a respondeat superior theory of municipal liability; the District cannot be held liable simply because it employs a wrongdoer." *Olatunji v. District of Columbia*, 958 F. Supp. 2d 27, 32 (D.D.C. 2013).

Here, the District argues both that Lewis has not stated a viable claim for municipal liability and that she has not plausibly alleged that her termination resulted from intentional discrimination based on race. For the reasons below, the Court concludes both that Lewis has stated a "predicate claim" for discrimination under § 1981, and that she has plausibly alleged that a D.C. municipal policy was the "moving force" behind the § 1981 violation. *Baker v. D.C.*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). Because the District's motion focuses primarily on the municipal liability issue, the Court will begin there.

### A.    Municipal Liability

"There are a number of ways in which a 'policy' can be set by a municipality to cause it to be liable under § 1983" for a violation of § 1981. *Id.* Those include: (1) "the action of a policy maker within the government"; (2) "the explicit setting of a [discriminatory] policy by the government"; (3) "the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom'"; and (4) "the failure of the government to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in" unlawful discrimination. *Id.*

### 1. Policymaker Liability

Here, Lewis plausibly alleges municipal liability under a "policymaker" theory, via the asserted actions of Fire Chief Donnelly. The "policymaker" theory recognizes that, in appropriate circumstances, a discriminatory "governmental policy c[an] be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). However, "only those municipal officials who have *final* policymaking authority may by their actions subject the government to § 1983 liability," and "whether a particular official has final policymaking authority is a question of *state law*." *Id.* (emphasis added and quotation marks omitted). "If an official's discretionary decisions are constrained by policies not of that official's making, then those policies—rather th[a]n the official's departure from them—are the act of the municipality." *Byrd v. D.C.*, 807 F. Supp. 2d 37, 75 (D.D.C. 2011).

According to Lewis, Chief Donnelly has "the sole and exclusive power to refer [DCFEMS] personnel to a trial board." Compl. ¶ 19. He is also responsible for appointing the members of the board, and for providing it with a recommended disciplinary outcome in each case. *Id.* ¶¶ 22, 26. While the trial board may reject that recommendation, the Fire Chief is not bound by its decision: he allegedly has "unfettered discretion to accept, reject or modify the decision of a trial board." *Id.* ¶¶ 27, 47. Moreover, Lewis alleges that, although D.C. law grants the Mayor authority to discipline DCFEMS personnel, the Mayor since 2007 has "fully and unequivocally delegated such power[] to the Fire Chiefs." *Id.* ¶¶ 48–50. Thus, as alleged in the complaint, "[t]he Fire Chief's decision and judgment on disciplinary matters," including his decision in this case to accept Lewis's termination, "renders a final decision" that is contestable only through arbitration or an appeal to the OEA, OHR, or EEOC. *Id.* ¶¶ 33–34, 54.

10

Lewis has therefore adequately alleged that Fire Chief Donnelly was a final municipal policymaker with respect to Lewis's termination. *See* Compl. ¶¶ 180–81; *Byrd*, 807 F. Supp. 2d at 75 (policymaker's actions must be "specific to the tortious conduct"). It is true that "the D.C. Code gives no specific grant of authority to the Fire Chief to set final policy," and instead "reserve[s]" that authority to the Mayor and the City Council, as noted above. *Coleman v. D.C.*, 828 F. Supp. 2d 87, 92 (D.D.C. 2011) (citing D.C. Code § 5–402(a)). But Lewis asserts that the City Council specifically delegated that authority to the Fire Chief, and the District makes no argument to the contrary. Indeed, the District faults Lewis for *failing* to "allege that Mayor Muriel Bowser was involved with . . . her referral to the trial board or her termination." Mot. at 15. Nor, faced with Lewis's allegation that the Fire Chief has complete power to reject or modify the disciplinary decision of the trial board, does the District argue that the board itself "constrained . . . his exercise of discretion." *Coleman*, 828 F. Supp. 2d at 92 (finding that, while the question was "close[]," Fire Chief was not final policy maker "[t]o the extent that [he] was required to follow the recommendation of the Trial Board").

Instead, the District's only argument on this question is that Fire Chief Donnelly's discretion is constrained by "Article 9 of the collective bargaining agreement between DCFEMS and the Union, which 'outlines the procedures for [the] filing and hearing of grievances, and sets out the timeline and appeals processes for disciplinary actions.'" Mot. at 14–15 (quoting Compl. ¶¶ 13–14). But the District does not explain how the requirement to follow certain *procedures* when issuing discipline in any way restricts the Fire Chief's authority as to the substantive decisions of whether or what discipline should issue. It thus appears plausible that the Fire Chief was a final policymaker regarding Lewis's termination, permitting the imputation to the District of any discriminatory action by him.

11

### 2. Remaining Theories of Municipal Liability

Lewis's complaint also invokes the other three theories of municipal liability articulated in *Baker*. *See* 326 F.3d at 1306. But none is supported by sufficient factual allegations to survive a motion to dismiss.

*First*, Lewis appears to suggest that DCFEMS maintains an "explicit policy" of discrimination because its "trial board policy itself is discriminatory against African Americans." Compl. ¶ 183. But Lewis's only discernible support for that assertion is her allegation that DCFEMS "has repeatedly terminated Black fire fighters for transgressions for which similarly situated fire fighters were not disciplined at all." *Id.* ¶ 85. Facts about "whether [DC]FEMS has acted in a similar manner toward other employees" "may be relevant to the [other] *Baker* tests, but they are irrelevant to whether the District has set an 'explicit' policy" of discrimination. *Coleman*, 828 F. Supp. 2d at 91. Indeed, Lewis's complaint actually undermines that conclusion, insofar as it alleges that that DCFEMS' trial board policies *lack* content, and are "vague and without parameters." Compl. at 4.

*Second*, Lewis's complaint repeatedly asserts that DCFEMS has a "pattern, practice[,] and custom of discriminatory behavior towards African American fire fighters," "especially in disciplinary matters." *Id.* at 4 & ¶ 62. But "[w]hen a plaintiff seeks to establish 'custom and policy' municipal liability under § 1983 in the absence of an express policy, she must allege concentrated, fully packed, precisely delineated scenarios as proof that an unconstitutional policy or custom exists. To clear this high hurdle, plaintiffs ordinarily couch 'custom or practice' liability on allegations of practices so persistent and widespread as to practically have the force of law." *Page v. Mancuso*, 999 F. Supp. 2d 269, 284 (D.D.C. 2013) (citations and additional quotation marks omitted).

Lewis has not done so here. She points first to a complaint in a separate case pending in this court, *Clark et al v. District of Columbia*, No. 23-cv-1564, which alleges that DCFEMS engages in a discriminatory practice of "denying Black and female Captains from being on trial boards" by "maintain[ing] a policy that people who transferred from the EMS service into firefighting cannot sit on trial boards." *Clark*, ECF No. 26 ¶¶ 247, 558. According to Lewis, the "impact of this [practice] is to subject Black firefighters to the disciplinary decisions of white officials," thereby leading to their "harsher discipline." Compl. ¶¶ 23–25. But even crediting that inference, the court in *Clark* recently dismissed the plaintiff's § 1981 claim regarding supposed racial discrimination in trial board appointments, finding that the plaintiff's "own allegations faile[d] to support even a racially disparate impact [of the challenged policy], much less a statistical disparity sufficient to support an inference of intentional discrimination." *Clark*, ECF No. 60 at 29–30. Those allegations from *Clark* thus cannot support the existence of a custom of discriminatory discipline at DCFEMS.

Lewis also points to the allegations of two other African American DCFEMS employees in a second case pending in this court, *Sanders v. District of Columbia*, No. 22-cv-2259. Like Lewis, those employees allege being referred to trial boards with recommendations of termination over "transgressions for which similarly situated white firefighters were not disciplined at all." Compl. ¶¶ 85–89, 95, 98, 102. But even three instances of purportedly excessive discipline does not "compose a common or widespread pattern of [discrimination] adequate to establish § 1983 municipal liability." *Carter v. District of Columbia,* 795 F.2d 116, 123–24 (D.C.Cir.1986) (evidence of thirteen "actual instances of [police] misconduct," including seven deaths in a two-month period, was "not sufficient to demonstrate a pervasive pattern of . . . excessive force"). And in any event, the *Sanders* plaintiffs were both "exonerated" at the trial board, tending to undermine

13

the inference that there is a "pervasive" culture of discriminatory discipline at DCFEMS. Compl. ¶¶ 93, 103.

In a final effort to support her "custom or practice" assertions, Lewis cites to several of DCFEMS' own surveys of its disciplinary practices, as well as to a 1990 consent decree in which DCFEMS settled a class action "alleging that it had engaged in systemic race discrimination against African American firefighters." *Id.* ¶ 63 (citing *Hammon v. Barry*, 752 F. Supp. 1087 (D.D.C. 1990)). But a thirty-year-old settlement agreement regarding discriminatory hiring and promotion practices is not probative of discriminatory *disciplinary* practices in 2020. *See Hammon*, 752 F. Supp. at 1090. A 2008 internal survey supposedly finding "a significant disparity in disciplinary action for African American employees" at DCFEMS is similarly stale. Compl. ¶¶ 68–69. And while DCFEMS surveys from 2019, 2020, and 2021 are at least timely, Lewis is incorrect that they conclusively show "African American firefighters were more than twice as likely [as white firefighters] to have been referred to a trial board, and more than three times as likely to be terminated at a trial board." *Id.* ¶¶ 74–76. The reports make no indication of the racial composition of DCFEMS *as a whole* during the years in question, meaning that they cannot alone demonstrate a statistically significant racial disparity in discipline referrals or outcomes.[2] *See* ECF No. 10-3.

*Finally*, Lewis asserts that, because DCFEMS was "well aware of racial disparities in discipline at DCFEMS . . . since at least 2008" and yet "took no measurable or material actions to

---

[2] Lewis also alleges that "the [Firefighters] Union has a pattern, practice and culture of only exercising its power to protect employees from harsh discipline on behalf of those who are in favor with Union leadership, which has resulted in such efforts extending almost exclusively white male fire fighters." Compl. ¶ 42. But the Union is a separate entity from DCFEMS, so allegations of discrimination by the Union cannot establish a custom or practice of discrimination for purposes of municipal liability.

14

address the problem," the District can be held liable for her termination under a deliberate indifference theory. Compl. ¶¶ 72–73. That theory of liability imposes "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Page*, 999 F. Supp. 2d at 282. Where, as here, Lewis has not plausibly alleged that DCFEMS had either an explicit policy or an implicit custom of racially discriminatory discipline, she also has not plausibly alleged that such discipline was a "known or obvious consequence" of DCFEMS' inaction. *See Tyson v. D.C.*, 2021 WL 4860685, at *13 (D.D.C. 2021) ("[T]here is significant overlap in the allegations supporting municipal liability under the third and fourth *Baker* prongs."). Indeed, Lewis does not defend the deliberate indifference theory in her opposition brief.

\*\*\*

In sum, Lewis has plausibly alleged municipal liability under the theory that Fire Chief Donnelly was a final policymaker acting with final policymaking authority when he chose to accept and enforce Lewis's termination. But Lewis has not plausibly alleged municipal liability under the other three theories just discussed. The Court will therefore strip those theories from the case and permit Lewis to proceed only under a final policymaker theory. The Court acknowledges, however, that this may not make much practical difference during discovery, since information relevant to the other theories of municipal liability may also be relevant to the merits of Lewis's § 1981 claim.

### B.  Elements of § 1981 Claim

To state a prima facie case of racial discrimination in violation of § 1981, a plaintiff must show "that (1) [s]he is a member of a protected class, (2) [s]he suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination (that is, an

inference that h[er] employer took the action because of h[er] membership in the protected class)." *Doe #1 v. Am. Fed'n of Gov't Emps.*, 554 F. Supp. 3d 75, 102 (D.D.C. 2021). "At the motion-to-dismiss stage, [a] plaintiff need not plead each element of h[er] prima facie case. Nonetheless, the complaint still must allege facts that, if true, would establish the elements of h[er] claim." *Id.* (citations omitted).

In its motion, the District argues at length that Lewis's § 1981 claim "fails because her referral to the trial board for disciplinary action did not constitute an adverse employment action." Mot. at 17. But as the District intermittently acknowledges, Lewis was not just referred to the trial board; she was terminated. *See, e.g., id.* at 22. The fact that her termination is not yet final because it is subject to an ongoing appeal outside of DCFEMS does not mean that it is not an adverse employment action. As Lewis notes in her opposition brief, if she does "not prevail in her appeal, her termination would automatically be in effect, and she will be separated from DCFEMS." ECF No. 15 (Opp.) at 21.

In its reply, the District appears to make a more nuanced argument that Lewis's termination is *irrelevant* to her § 1981 claim, which in is view "is solely premised on allegations that her *referral to the trial board . . .* was discriminatory." ECF No. 16 (Reply) at 11 (emphasis added). But the District's reading of Lewis's complaint is too wooden. Lewis alleges that Fire Chief Donnelly appointed the members of the trial board "for the express purpose" of ensuring her termination, and further alleges that he "made the decision to accept and enforce [her] termination . . . out of racial animus." Compl. ¶¶ 181–82. These statements clearly convey Lewis's claim that her termination, and not just her referral to the trial board, was motivated by race. Moreover, even if Lewis were challenging only the referral decision, it remains the case that she was terminated as a direct outcome of that referral. It seems likely that, under those circumstances, Lewis's

16

termination would still count as an "adverse employment action" for purposes of asserting a § 1981 claim.

The District also argues that Lewis's § 1981 claim fails because she has not pleaded facts sufficient "to show an inference of discrimination." Mot. at 20. But "[a] plaintiff can raise an inference of discrimination by showing that she was treated differently from similarly situated employees who are not part of the protected class," *Doe #1*, 54 F. Supp. 3d at 103, and Lewis has done so here. Her complaint alleges that, just four days after the incident involving herself and Ceasar, a group of four non-black DCFEMS personnel refused to make contact with a patient suspected of attempting suicide, yet faced no discipline. Compl. ¶¶ 165–67, 170. The District argues this comparator evidence is insufficient because Lewis does not allege that the other personnel "all held the same position as [her] or had the same years of experience she had when she was terminated"—a factor that the District contends is "material" in light of Lewis's statement that Ceasar avoided termination because "he was less experienced than [Lewis]." Mot. at 21–22 (quoting Compl. at 2). The District also argues that Lewis's purported comparators did not commit a sufficiently similar offense, because their alleged conduct did not involve a pediatric patient and Lewis did not specifically allege that they violated the exact same DCFEMS policies she is accused of violating. *Id.* at 22.

At the pleading stage, however, these minor gaps and omissions are irrelevant. One could find at least as many ways in which the comparators' alleged actions were perhaps more serious than Lewis's as ways in which they were perhaps less so. And Lewis's allegations that certain other black DCFEMS employees (like Ceasar and the *Sanders* plaintiffs) ultimately were *not* terminated after their trial board referrals cannot somehow defeat her allegations of disparate treatment. *Contra* Mot. at 21. In sum, then, the conduct of the non-black DCFEMS personnel is

17

at least "comparable" to Lewis's, raising a plausible inference that she was treated differently based on her race. *Doe # 1*, 554 F. Supp. 3d at 103. Lewis may not ultimately prove her case. But at present, she is entitled to discovery to address the various factual questions the District raises.

## IV.  Conclusion

For the foregoing reasons, the Court will deny the District's motion to dismiss. However, because Lewis has only plausibly alleged municipal liability based on a "final policymaker" theory, her case must proceed solely under that theory of liability and not the others identified in her complaint.

An Order will accompany this Opinion.

DATE: March 31, 2025

_____
CARL J. NICHOLS
United States District Judge